# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 9, 2013

## JUNIOR ALDRIDGE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 05-08430    W. Otis Higgs, Jr., Judge**

---

**No. W2012-02409-CCA-R3-PC  - Filed September 19, 2013**

---

The petitioner, Junior Aldridge, appeals the denial of his petition for post-conviction relief from his convictions for first degree murder, second degree murder, and especially aggravated robbery. On appeal, he raises three allegations of ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Lance R. Chism (on appeal) and Alexander Wharton (at hearing), Memphis, Tennessee, for the appellant, Junior Aldridge.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and David Zak, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted by a Shelby County Criminal Court jury of first degree murder, second degree murder, and especially aggravated robbery. State v. Junior Aldridge, No. W2007-01722-CCA-R3-CD, 2009 WL 1579239, at *1 (Tenn. Crim. App. June 5, 2009), perm. app. denied (Tenn. Oct. 19, 2009). The trial court merged the murder convictions and imposed, on the remaining convictions, concurrent sentences of life imprisonment and forty years. Id. The trial court's judgments were affirmed on direct appeal, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal. Id. The facts

giving rise to his convictions were summarized by this court on direct appeal as follows:

At trial, Jeremy Hull testified that on March 10, 2005, he drove his uncle, Travis Clariett, the victim in this case, from Clariett's mother's home in Burton, Mississippi, to Memphis in an attempt to retrieve the victim's car. Hull said that once he arrived at the Mississippi residence, the victim's girlfriend, Renarda Irving, arrived in her car, and Hull and the victim followed Irving to Memphis. Hull lost sight of Irving but the victim led Hull to Irving's house. The two men left Irving's house, went to a fast food restaurant down the street, then returned to the house. Soon after the two men returned to Irving's house, Irving arrived. Hull said that she asked the victim to come into the house, but the victim refused.

Five to ten minutes later, an "older guy," whom Hull identified as the [petitioner] at trial, pulled up in the victim's car, parking the car behind Hull's car. Hull said that the [petitioner] went into the house two or three times; Irving initially stood on the front porch, but eventually she and the victim got into the victim's car, with the victim sitting in the driver's seat and Irving sitting in the front passenger seat. Hull said that the second or third time the [petitioner] exited the house, he carried a plastic bag in his hand. Hull said that in his rearview mirror he saw the [petitioner] walk to the rear passenger side window, take a gun out of the bag, shoot the victim, and run away. Hull said that after he saw [the petitioner] shoot the victim, he drove off because he "didn't know where the next shot was going." Hull later identified the [petitioner]'s photograph in an array prepared by the Memphis Police Department.

On cross-examination, Hull said that Irving was the victim's girlfriend, not his wife. Hull said he knew the victim fairly well and knew that the victim and Irving had been dating for some time, but he never spoke with the victim about the relationship and had never met Irving before the day of the shooting. He testified that when Irving arrived at the residence in Mississippi, she put some of the victim's clothes in the back seat of Hull's car before driving away. According to Hull, Irving said nothing to the victim at this time. Hull said that he was unaware why Irving had the victim's car at the time, but he did not believe that Irving had taken the car from him.

Hull testified that once they arrived at Irving's home and discovered that she was not there, they went to a fast food restaurant, where they spent twenty-five to thirty minutes before returning to Irving's residence, where she

-2-

was waiting. Hull said that the victim did not appear nervous before being shot. He said that Irving "holler[ed]" at the victim two or three times in an attempt to get him to go inside her house, but he refused. Hull said that while Irving was not calm, the extent of her and the victim's argument involved the victim saying "no" to Irving's entreaties.

Hull admitted that on the day of the shooting he told police that while he was aware that the shot came from the passenger side of the victim's car, he did not know whether the shot came from the front or rear window. He also admitted that he told police that he put his car in drive before the victim was shot. However, he insisted that despite this statement to police, the [petitioner] shot the victim from the rear passenger window and that he (Hull) drove away after the victim was shot.

On redirect examination, Hull said that the victim had around $2500 in his possession before the shooting. He said that he saw Irving after the [petitioner] shot the victim, and that Irving was "hollering and crying" after the incident. Hull said that he did not see Irving with a weapon during the incident.

Irving testified that on March 10, 2005, she met with the victim to return his car to him. Irving, who said that she had keys to the victim's car, testified that she and the victim also planned for the victim to give her "tax money" that day. Irving explained that the victim claimed her daughter as a dependent on his income tax returns even though she and the victim were not married and he was not the girl's father. Irving said that the victim would receive a larger income tax refund under this arrangement than she would receive were she to claim her daughter; the victim and Irving agreed that he would give this money, totaling $2500, to her.

Irving said that she went to the victim's mother's house in Mississippi and led the victim and his nephew, Hull, to her house, which she shared with another woman, Lisa Mays. Unlike Hull, Irving testified that she and Hull arrived at the house at the same time. Irving said that the [petitioner], whom she came to know after the [petitioner] worked on her car, was present when she, the victim, and Hull arrived at the house. She and the [petitioner] went to retrieve the victim's car; once they arrived at the house where the car was located, Irving and the [petitioner] returned to her house separately, with Irving driving her car and the [petitioner] arriving in the victim's car fifteen to twenty minutes later. Irving said that the [petitioner] parked the car in front of the

house, behind Hull's car.

Irving said that once the [petitioner] arrived in the victim's car, the [petitioner] left the car, leaving the keys in the ignition. The victim and Irving then got into the victim's car, with the victim sitting in the driver's seat and Irving sitting in the front passenger seat. At that time, the victim removed money from his pocket and began counting it. The victim counted $500 and gave it to her. Irving said that while the victim was counting money, the [petitioner] came to the car. The victim told the [petitioner] to go to the house and get his shoes. The [petitioner] exited the house the first time without the shoes, at which time the victim told the [petitioner] to return to the house and ask Lisa Mays, Irving's roommate, where the shoes were. The [petitioner] returned to the house and emerged a second time, carrying a plastic bag. The [petitioner] asked the victim to lower the rear passenger side window, which the victim did. At that point, the [petitioner] hit Irving in the head with a gun and demanded that she and the victim give him their money. Irving then gave the [petitioner] some money before hearing a shot. She then saw the victim fall halfway out of the car and the [petitioner] run away. Hull drove away after the shot was fired, but he later returned. Irving testified that at the time the victim was shot, he was facing her, with his back to the driver's side window. She said that from this position, the victim could see the [petitioner].

On cross-examination, Irving said that while she referred to the victim as her husband, she and the victim were not legally married. Irving said that at one point she and the victim participated in what she believed was a wedding ceremony; she said that only she, the victim, a man who was working at the house that day, and Melvin Smith, the man whom Irving believed presided over the ceremony, attended. Irving believed she was married to the victim after the ceremony; however, she later learned that the wedding ceremony was not valid.

Irving said she was unaware that the victim's claiming her daughter on his income tax return constituted fraud. Regarding the victim's car, Irving denied taking the car without his permission and using it as "collateral" or "leverage" which would force the victim to pay the money he owed her from his tax return. She also denied hiding the car from the victim. Rather, she said that a few days before the shooting, the victim told her to take the car from the victim's workplace and bring it to a friend's house to be repaired. Irving said that she was unaware that the victim had the tax refund money until he called her the morning of the shooting.

-4-

Irving said that by the day of the shooting, the victim had moved out of the house which they and Mays had shared. However, she insisted that their relationship was a "good" one and would have continued had the victim not been killed. Irving denied hitting the victim or calling him names. Irving also denied yelling at the victim or trying to convince him to come inside the house before the shooting. Irving said that during the fifteen minutes between her arrival at her house the second time and the [petitioner]'s arrival with the victim's car, she and the victim had a calm conversation, with her standing outside Hull's car and the victim seated inside Hull's car. Irving claimed that the victim did not appear to be scared of her during this conversation.

Irving said that she had not expected to see the [petitioner] the day of the shooting, but she was not scared when she first saw him or when she asked him to help her retrieve the victim's car. Irving said she did not tell the [petitioner] about the money the victim was planning to give her. She said that she did not see where the victim was shot.

Anthony Franklin testified that on the afternoon of March 10, 2005, he was returning home from his job as a security guard. While at a stop sign near the intersection of Carnes Avenue and Greer Street, he saw "a male black approach [ ] [a] vehicle from the passenger side and fire[ ] shots into the vehicle." Franklin then saw the shooter run away. Franklin further described the shooter as being "[a]bout six feet in height, slim build, wearing dark clothing and a black leather jacket." He said that the [petitioner] looked like the shooter but that he was unsure that the [petitioner] actually committed the offense. Franklin added that the shooter, who was carrying an object in a plastic bag, "approached the vehicle from the rear" before firing into the rear passenger side window. Franklin said that the house in front of which the incident occurred was two houses from the intersection at which he stopped; while Franklin initially saw the shooter approach the car while he was at the intersection, he drove past the victim's car when the shooting occurred. Franklin said that he did not know whether anyone was sitting in the front passenger seat when the shooting occurred, and he did not hear any screaming coming from the car before the shots were fired. On cross-examination, Franklin admitted that he did not see the shooter actually fire into the car, but that he instead only heard gunshots.

Officer Lavern Jones with the Memphis Police Department testified that he was the crime scene investigator assigned to this case. Officer Jones testified that he found a purse and some money on the front passenger side

floorboard of the victim's car. He said that he found approximately $750 inside the car, some of which was in the purse and some of which was on the floorboard. The officer also recovered a .40 caliber shell casing from atop a jacket on the front passenger seat. He said that his service weapon was a .40 caliber semi-automatic pistol, and in his experience the gun ejected its spent shell casings to the right. On cross-examination, Officer Jones said that he did not see any bullet strikes inside the car, nor did he see any money outside the car.

Dr. Kenneth Snell, who at the time of the shooting was the chief medical examiner for Shelby County, testified that he performed the autopsy in this case. Dr. Snell testified that the victim died of a single gunshot wound to the chest. The bullet, which Dr. Snell described as a "large caliber" projectile, entered the victim's right upper chest and traveled "from the decedent's right to left, front to back . . . [with] a downward movement as well." Although Dr. Snell characterized the bullet's path as a "downward movement," on cross-examination he admitted that the bullet exited the victim's body on a level only a half inch below the level on which the bullet entered the body. Dr. Snell said that the victim's injuries could have been caused by someone shooting from the vehicle's rear passenger window if the victim had been turned facing the window, although on cross-examination Dr. Snell testified that the shot could also have been fired by someone sitting in the front passenger seat. Dr. Snell said that weapons fired at close range usually resulted in soot being left on the body, but no soot was found on the victim's body or clothes. However, Dr. Snell said that he did not use a microscope to search for stipling [sic] on the victim's clothes or body. Dr. Snell said that semi-automatic weapons generally eject their spent shells to the right, but he noted that he was not a ballistics expert and could not say with certainty from where the fatal shot was fired.

Reverend Melvin C. Smith, testifying for the [petitioner], said that he did not perform wedding ceremonies outside his church. He said that he did not know the victim or Irving and did not preside over any ceremony involving them. Dr. O.C. Smith, the former chief medical examiner for Shelby County, testified that because "in the whole width of the body the bullet descended only half an inch," one would be unable to determine the angle at which the fatal shot was fired. Dr. Smith said that while someone sitting in the front passenger seat could have fired the fatal shot, the shot could also have come from the rear passenger window.

Jacoby Burks testified that he knew the victim for about five years before his death. Brooks said that he saw at least one, but fewer than five, arguments between the victim and Irving, whom he knew were dating, and that Irving punched the victim during some of these arguments. On cross-examination, Burks said that only one of the arguments between the victim and Irving devolved into a physical confrontation and that this confrontation ended rather quickly. Burks admitted that "[m]ost of the time" when he saw the victim and Irving, they were not fighting.

The jury found the [petitioner] guilty of one count of first degree felony murder and one count of especially aggravated robbery as charged in the indictment. The indictment also charged the [petitioner] with one count of premeditated first degree murder. The jury acquitted the [petitioner] on this count but found him guilty of the lesser included offense of second degree murder, which the trial court merged with the [petitioner]'s first degree murder conviction.

Id. at *1-5.

On May 10, 2010, the petitioner filed a *pro se* petition for post-conviction relief and, following the appointment of counsel, an amended petition was filed. In his petitions, the petitioner asserted, among other things, that he received the ineffective assistance of counsel because counsel failed to present an alibi defense or conduct voir dire of the jurors individually as to whether they heard the trial court's comments at the motion for judgment of acquittal hearing, and that the trial court erred by not granting a mistrial or individually polling the jurors regarding the comments. The post-conviction court conducted evidentiary hearings on February 2 and 16, 2012.

Counsel, one of the petitioner's two attorneys, testified that he was appointed to the petitioner's case in November 2005 and that he hired an investigator who worked on the case for the eighteen months preceding trial. Counsel had no recollection of the petitioner's talking about a garage where he worked or any alibi witnesses. Counsel said that the petitioner's "position throughout" was that he was present at the scene of the murder but that it was Renarda Morrow[1] who had actually killed the victim, and they called an expert to testify that Morrow could have committed the shooting. Moreover, in addition to the petitioner's admission that he was at the scene, witnesses placed the petitioner at the scene as well. As such, they did not present alibi as a theory of defense.

---

[1] Counsel later testified that Morrow "had several names," including Irving.

-7-

Regarding the mistrial issue, counsel testified that there was a discussion that the jury may or may not have overheard. Counsel "believe[d]" that he asked the judge to poll the jury to see if anyone heard anything but did not recall whether the judge did so.

Counsel recalled that there were allegations that the victim and Morrow were involved in a scheme to defraud the government of tax money and, therefore, on the day of trial, the State made the petitioner a twenty-year offer on the reduced charge of second degree murder. Counsel relayed the offer to the petitioner, and they discussed it. Counsel told the petitioner that "there was a high likelihood of conviction . . . [and] [t]hat he should consider the plea." Counsel and co-counsel talked to the petitioner for "about an hour" and called the petitioner's mother. However, jury selection began before the petitioner had time to decide whether to accept it, and counsel did not request a continuance. Counsel did not think that the petitioner had sufficient time to consider the offer. However, counsel admitted that prior to trial, he discussed with the petitioner that he was going to try to get an offer on second degree murder and that, if he did, the petitioner should take it because of the high likelihood of conviction.

Co-counsel testified that he drafted the motion for new trial and appeal. He did not recall an issue about the trial judge making comments on the record that were possibly overhead by the jury.

The petitioner testified that another attorney represented him prior to the preliminary hearing and that he told the attorney that he was working at Carsell's Garage at the time of the murder and that his mother and others at the garage could provide an alibi. However, that attorney had to step down from his case because of a conflict. The petitioner said he gave counsel the same information about his alibi witnesses that he had given his prior attorney, but counsel told him that an alibi defense "wouldn't do any good" because he was positively identified at the scene by two witnesses.

The petitioner testified that an offer was made prior to the beginning of trial. However, he explained, "[B]ut it was speedy, you know, it was explained to me, but as he was explaining to me, he was calling us in for the Court. And the jury was coming in at the time, so you know, I said well let's just go on with the trial." He said that he did not have adequate time to consider the offer, so he "just picked . . . the path that [he] was already going down."

The petitioner testified that the bailiff was entering the courtroom with the jury at the same time the trial judge was saying that the prosecutor had presented credible evidence of guilt. The judge questioned the bailiff about what he heard, and the bailiff said that he heard the judge talking but could not distinguish what was said. The court questioned the jury as a whole but did not pool each individual juror. The petitioner recalled that co-counsel

requested a mistrial, but the court denied the motion.

On cross-examination, the petitioner testified that the first time he heard about the possibility of entering a plea was when the offer was extended. Asked if he would have taken the twenty-five-year offer, the petitioner responded, "I couldn't say." He elaborated, "[T]he reason I said that I couldn't say that is because I don't know, at the time, if I had more time to think about it, whether I would have, or not. But, at the time I feel like I had a better chance with the jury." The petitioner acknowledged that he wanted the jury to hear his side of the story and wanted to see if it believed his defense.

Minnie Mayhorn, the petitioner's mother, testified that the petitioner's attorneys never asked her to come to trial. With regard to the day of the murder, Mayhorn said that she did not know how the petitioner could have "killed somebody just that quick" because "it wasn't twenty minutes" from the time the petitioner left her house until "the lady came back up there talking about he had shot her husband." Asked if she spoke with the petitioner about his case, Mayhorn said, "I would ask him and he wouldn't tell me. All he knows is that he said, when he tells me he done been to trial and back wherever he was." She admitted that the petitioner never told her that she needed to say something on his behalf.

On cross-examination, Mayhorn could not recall what day the incident happened. However, she recalled that the petitioner was in her yard working on a white vehicle that he was getting ready to take back to the owner. Asked if the petitioner could have driven to the murder scene, less than a mile from her house, and committed the murder, Mayhorn said that it would have been "impossible" for the petitioner to have done so. Mayhorn did not know what time the petitioner left her but maintained "it wasn't twenty minutes before the lady came back and said[] he shot her husband."

In denying the petition, the post-conviction court found, relevant to the issues on appeal, that counsel "made an informed and reasonable tactical decision not to pursue a defense based upon alibi"; that there was "nothing ineffective in counsel['s] actions" regarding the plea offer; and that there was nothing improper in how the trial court handled determining whether the jury heard its comments and denial of a mistrial.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate

court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or

-10-

prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner argues that he received the ineffective assistance of counsel because counsel failed to investigate his alibi, failed to request a continuance to give the petitioner additional time to consider the State's offer, and failed to ask that the trial court individually poll the jurors to determine whether the jurors heard the trial court's comments at the hearing on the motion for judgment of acquittal.

## A.  Alibi Defense

The petitioner asserts that counsel was ineffective for failing to investigate an alibi defense.  He claims that his testimony that he told counsel about his alibi was more credible than counsel's testimony that the petitioner admitted he was at the scene of the murder.  He also claims that there is a reasonable probability that the outcome of the trial would have been different had his mother testified as a witness at his trial.

As to this issue, the post-conviction court found that "counsel made an informed and reasonable tactical decision not to pursue a defense based upon alibi," given that multiple witnesses identified the petitioner as the person who shot the victim and the petitioner's claims that Renarda Irving was the shooter.  The post-conviction court implicitly discredited the petitioner's mother's testimony that the petitioner was gone from her home an insufficient amount of time to have committed the murder.

The record supports the post-conviction court's determination.  Counsel's testimony at the evidentiary hearing, which was accredited by the post-conviction court, was that the petitioner's position throughout the case was that he was present at the scene but that Irving committed the murder.  In addition, witnesses placed the petitioner at the scene as well.  Counsel said that, for these reasons, they did not present an alibi defense.  Counsel's decision to not pursue an alibi defense was a reasonable, strategic decision that we will not second-guess.  See Hellard, 629 S.W.2d at 9.  Moreover, even assuming deficient performance, the petitioner cannot show any reasonable probability that the testimony of his mother would have changed the outcome of the trial.  The murder scene was less than a mile away from the petitioner's mother's house and thus did not rule out that the petitioner could have committed the crime in the twenty-minute time frame identified by his mother.  Moreover, several eyewitnesses to the crime identified the petitioner, while his mother would have been eyed by the jury as possibly having a motive to be less forthcoming.  The petitioner is not entitled to relief on this issue.

## B.  Offer

The petitioner next argues that counsel was ineffective for not seeking a continuance so he could have additional time to consider the State's plea offer of twenty years that was relayed to him prior to the start of trial.

As to this issue, the post-conviction court found that there was "nothing ineffective in counsel['s] actions." The court stated that even though both counsel and co-counsel indicated that they would have liked for the petitioner to have had more time to consider the offer, "[counsel] testified that prior to the start of trial he had discussed with [the] petitioner the potential of a plea offer and had advised [the] petitioner that if an offer was made he should accept the state's offer." The court noted that the petitioner had an opportunity to discuss the offer with counsel and his mother but decided that he wanted to present his version of events to a jury.

The record supports the post-conviction court's determination. At the evidentiary hearing, counsel testified that he discussed with the petitioner that he was going to try to get an offer on second degree murder and that, if he did, the petitioner should take it because of the high likelihood of conviction. The record of the trial reveals that the trial court stated that it was informed during a break after jury selection that there was a possible settlement in the case and that the petitioner "had apparently given his attorneys assurance that he would accept the settlement." The court continued that it had sent the jury home to pack and, during the interim, the petitioner had evidently changed his mind and no longer wanted the settlement.

The record reveals that the court addressed several other matters and then, prior to opening statements, the petitioner's trial counsel asked to voir dire the petitioner regarding the plea. The petitioner acknowledged that he understood the charges against him and that he faced a possible life sentence. He acknowledged that the State's offer was for twenty years and, with good behavior and jail credits, he might only have to serve fourteen and a half years. Nevertheless, the petitioner told the court that he did not want to accept the plea, that he understood the risk he was taking, and that no one had forced him to make this decision. Thus, the record shows that the petitioner was put on notice before trial that an offer might be forthcoming and, after the offer came, was not forced to make a snap decision regarding whether to accept or reject it. Under these circumstances, we cannot conclude that counsel rendered deficient performance in not moving for a continuance.

In any event, there is no proof that the petitioner would have taken the plea. At the evidentiary hearing, almost five years later, the petitioner still "couldn't say" whether he would have taken the plea had he had more time to think about it.

### C. Poll Jurors

The petitioner lastly argues that counsel was ineffective for failing to poll the jurors individually regarding whether they overheard the trial court's comments during the hearing on the motion for judgment of acquittal. The petitioner admits that, in his amended petition, he did not allege that counsel was ineffective for failing to ask the trial court to individually poll the jurors but, instead, alleged that the trial court erred by not granting a mistrial or individually polling the jurors. The petitioner asserts on appeal that the issue is nonetheless properly before this court because "in his pro se petition for post-conviction relief he clearly blames trial counsel for not seeking permission to individually poll the jurors." However, the amended petition did not incorporate the *pro se* petition by reference and, as a result, the post-conviction court ruled in its post-conviction order only on the propriety of its own actions.

In its ruling, the post-conviction court addressed this issue as follows:

> Lastly, [the] petitioner argues he should be granted a new trial based upon the inadequate efforts of the trial court to ascertain whether the jury overheard the court's comments during a jury out hearing on the petitioner's motion for judgment of acquittal. During the hearing on [the] petitioner's motion, the trial court indicated the state had presented testimony from eye witnesses that the [petitioner] shot the victim. The trial judge further stated, "We have testimony that money was taken. I am not allowed at this point to assess credibility. I must assume that all the state's witnesses were truthful. So for that reason, I am going to respectfully deny your motion at this time.

> Shortly after the court's ruling, [co-counsel] brought to the attention of the court the fact that, during the court's comments about the evidence, the back door to the courtroom was open and the jury, accompanied by the bailiff, was waiting in the hallway to re-enter the courtroom. [Co-counsel] stated, "I'm not sure what the jury just heard, but they were standing right there when Your Honor uttered the words, we have credible evidence that [the petitioner] shot this person." In response to [co-counsel's] inquiry[,] the trial judge inquired whether the bailiff could hear what was being discussed in the courtroom as he approached the open door. In response to the court's question, the bailiff stated, "I couldn't discern anything that you were saying, I just knew you were talking." The trial court asked if the jury heard anything, to which the bailiff responded, "No, they were behind me, they couldn't hear anything either." The trial court then brought the jury in and inquired of the jury as a whole whether they heard anything that was being discussed in the courtroom. They jury responded in the negative. Thereafter, defense counsel made a motion for mistrial, which was denied.

. . . .

This court finds that the trial court properly inquired of the jury whether they were able to hear the court's comments and the jurors made a negative nonverbal response. The court noted on the record that every juror shook their head no, indicating they did not hear anything. The court gave the jurors ample opportunity to indicate that they had heard the court's comments. [The] [p]etitioner has presented no case law in support of his position that the trial court's approach was inappropriate or that individual questioning of the jurors was mandated. Moreover, [the] petitioner has failed to demonstrate that a manifest necessity existed which required the court to declare a mistrial. Thus, [the] petitioner is not entitled to relief based upon this claim.

In any event, the petitioner has failed to prove that counsel was ineffective for not requesting that the trial court poll the jury. We note that the petitioner's proof at the evidentiary hearing as to this issue was limited to asking counsel and co-counsel if they remembered the episode and asking counsel if he requested that the trial court poll the jury. The record from the trial shows that, in ruling on the motion for judgment of acquittal, the trial court commented, "Well, we have eye witness testimony that the [petitioner] shot this man and we have testimony that money was taken." At that point, the bailiff asked if the court was ready for the jury. The court responded for the bailiff to close the door and then continued with its ruling, "We have testimony from eye-witnesses that the [petitioner] shot him. We have testimony that money was taken. I am not allowed at this point to assess the credibility. I must assume that all the state's witnesses were truthful. . . . I am going to respectfully deny your motion at this time." Co-counsel then called it to the court's attention that the jury was "standing right there when [the court] uttered the words, we have credible evidence that [the petitioner] shot this person."

The court questioned the bailiff, who stated that he could tell there was a discussion going on but could not discern what was being said, which prompted him to ask the court if it was ready for the jury. The bailiff said that the jury could not hear anything either. The court questioned the jury as a group, and the jurors indicated that they had not heard anything. After giving the jury instructions on an unrelated matter, the court called the parties to the bench and asked co-counsel if the manner in which the court handled the issue was satisfactory. Co-counsel stated that he saw "the jurors standing there when [the court] w[as] speaking" and moved for a mistrial. The court denied the motion, noting that "every juror shook their head, no, that they didn't hear anything."

There is simply no proof that counsel performed deficiently in not asking the court to poll the jury. The record shows that counsel acted reasonably in this situation: he raised an

-14-

objection, the court conducted an inquiry, and the jury indicated that it had not heard what transpired.  Moreover, the petitioner presented no proof that polling each juror individually would have likely revealed that any of the jurors overheard the trial court's statements, or that if the court's statements were overheard that such might have affected the outcome of the trial.  All the court did was recap the evidence that had already been heard by the jury and state that it could not make any credibility finding on that evidence.  It is complete speculation that the jury was prejudiced based on the court's recapping of evidence that it had already heard.  The petitioner is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of post-conviction relief.

_____
ALAN E. GLENN, JUDGE